We only have one case before the Court for argument today. This case was originally set for a travel day of March 23rd, but because the parties were not informed of that, they could not have anticipated any conflicts for that timeframe. So we moved the argument to today. The case is Case No. 151693, Intelligent Bio-Systems v. Illumina Cambridge Ltd. It is an appeal from the Patent Trial and Appeal Board. You want to reserve three minutes for rebuttal, Mr. Barron? Yes, please, Your Honor. Okay. May it please the Court. We're here today to review the PTAP's decision that the 537 claims were not obvious in light of Zhu, Chen, and Zabgarati. We think they erred, and we think they erred as a legal matter. Now, there's really no doubt that Zhu and Chen cover all of the claim limitations within the claims of the 537 patent, a method of labeling, except for the identification of the protecting group on the nucleotide as an azeto group or an azetomethyl. They don't explicitly say that. Zabgarati does, and in fact, it says, Zabgarati says that azetomethyl is of special interest and it's on the 3'-OH, the precise area that the claims require. Now, I mean, isn't part of the problem here is that you simply overstated? I mean, you have to provide a motivation. It doesn't have to be the same motivation that the inventor had with respect to the claims at issue. It can be any possible motivation coming from anywhere, but you chose a very specific motivation that had to do with accomplishing what Chen accomplishes, which is SBS. And having stated that that was the motivation, aren't you bound by that statement? I mean, you didn't present anything other than that before the response. Two things. We don't run away from the fact that we absolutely said that for the motivation. We don't think the board, as a threshold matter, ruled on motivation. What we're reading it to read is reasonable expectation of success. Motivation is a flexible, expansive filter. We think it's just of all the constellations of art in the world that may or may not cover claims. You have to have some motivation to reach out to a couple, and we point in our petition to more than a couple to suggest why a person of skill in the art looking at the SBS method, which we understand is narrower than the claims in the 537, at the SBS method would look beyond what was in Zhu or Chen and would look to Zab Gharani. It talks about going to sources for chemical synthesis. It talks about groups that have ether linkages, which azetomethyl has. Mom and Zhu, Mom and Aaliyah are mentioned by Zhu, and in Zab Gharani, he compares Mom, as we say in our petition, Mom and... But you kept referring back to accomplishing Chen's purposes. For motivation. So I think that there's two, I think motivation... Well, that's right. This is, I mean, part of the problem is, I mean, with respect, the parties seem to be talking all over each other. And I admit that the board's use of its language as it related to likelihood of success was, if not improper, at least confusing and misleading. But the problem is we actually review judgments, not the particular words chosen. So we have to look at the findings of fact and to see if those findings of fact support the board's conclusion that there was no showing of a motivation to combine, ultimately, right? I agree with that. I mean, I, we don't think that, we don't see the board finding that. I agree that it's not a, what's one of the problems, not a modicum of clarity. We think that they ruled on expectation, those are the words. So you think that they kind of just said, even if there was a motivation to combine, there's no reasonable expectation of success here. Yeah. I mean, I think the board's decision is very fuzzy here, too, but what it really seemed to me was they're saying, because nobody would think that this would work, there was no motivation to combine, which are two different things, I think. I agree with that. And I think that's a good point, Your Honor. And I think that the important way to, if we're going to view it through motivation, then the legal issue for Illumina to respond to is teaching away. I mean, that really is what you, that's the standard, it's an incredibly high standard. Illumina knew it's an incredibly high standard, they stayed away from it. They cite to DePue tantalizingly, but then they never go there, because they know they can't. Because there's nothing in Zhu or Chen that say, don't do azetamethyl, and there's certainly nothing in Zadgarani that says, by the way, this absolutely cannot be cleaved by any standard higher than 80%. Right, but what Chen teaches, though, is SBS that has a quantitative value to it, right? So Chen says that it would be, that this method should have cleaving efficiency near 100%. So we think there's a- And if Zadgarani doesn't give you that kind of cleaving efficiency, then why would you put the two together? So I think that's another legal error. I don't think, we reject that a person of skill in the art would look at Zadgarani and say, oh, no, I can't do that. Whether it's motivation- Well, that's not a legal error. That's a factual error, you're saying. Well, I don't think so. I would say no for two reasons. One, I think that what the board did, or what Illumina is trying to justify, is stripping that posita of their ordinary creativity, which is absolutely a legal issue. And what you have here are- But whether, I can't say it, I have no idea how to say it, but Zadgarani actually approached the 100% cleavability that Shen required, or not, as a factual issue. I think that the issue of- Isn't it? I mean- Yes, but I don't think that's the standard. I think that that's imposing an- and that's actually, this is not the first- But that's not, I'm not asking what conclusion you take from it. But whether or not it teaches 100% cleavability for this azido substance is a factual issue, and I don't see how there's a lack of substantial evidence to show that it doesn't. So I have two responses to that. One, it is factual, but the Walder case that we cite says that if the standard, the legal standard, whether it's the posita standard stripping the person of ordinary creativity, or an improper standard, either if it's motivation, it should have been teaching away. Which is not, where it has to say, don't do it. Well, the teaching away relates to, you teach away from the use of this as it relates to the claimed invention, right? And the problem is that, yes, the concept here is a little bit like teaching away, but it's not really a teaching away analysis. What you said is your motivation is to combine this to accomplish Chen's SBS. And what the board found, maybe not as clearly as it could, but it seems to me that what the board found is, well, you wouldn't put those together for that purpose because they wouldn't accomplish that purpose. It just simply wouldn't accomplish what Chen accomplishes. And I think that a person of skill in the art, you don't need certainty. You don't need a source to say it can be cleaved at 100%. Zavgarani doesn't have that. That's important to remember. Zavgarani just says, place it here, and it can be cleaved under mild and specific conditions. And what we do say in the petition, and in our supporting declaration of our expert, as well as in his first deposition before even there was a response, is, look, a person's going to look at the structural things. What Zhu and Chen teach are protecting group. It should be small. That you can't optimize. It's either small or it's not. Zavgarani said, and a person of skill in the art would say, OK, is either methyl small? It needs to be cleaved under mild and specific conditions. And that has a causal connection, as we mentioned in the petition and in our expert's deposition also, that has a causal connection. I mean, if something is mild and specific, it means two things about the protecting group. It means the bonds are not too stringent, so it actually can be cleaved. So there's a structural element to that. But beyond that, if it can be cleaved under mild conditions and it can be cleaved under specific conditions, which means tailored just to that bond and not everything in the solution, then you can really, you're in a setting where as a person of skill in the art, you can optimize. And one of our points- What evidence did you give the board that a person of skill in the art would have thought in the face of Lubino that it actually could accomplish the things you were talking about accomplishing? So, well, first of all, we say that Lubino actually is praising azetomethyl. And that the whole thing- But says you'll only get to 60 to 80%. But it uses the wrong standard. It uses pure product yield. And that's not something that Illumina ever submitted evidence. If you want to talk about substantial evidence, the fact is that only IBS presented evidence on the issue of cleaving efficiency, not pure product yield. So, and it sounds like, oh, it's a formal or, it's not. It's a very real thing. Yeah, but you had the burden here. No, no, I understand that. But Lubino was not, we cite to Zabgrani. Zabgrani doesn't cite to Lubino. They injected Lubino. So- But you don't dispute that Lubino was in the art and that one skill of the art would have understood all of these things, right? Here's what I think. I think I'm a person of skill in the art. I look at Zabgrani. Let's say I look at Lubino, too, and I say the 60 to 80. The standard is, I've been trained. Remember, the person of skill in the art, there's no debate, has a PhD in nucleotide chemistry and then five more years in a lab or on the bench. Extremely high skill we're talking about. And really, the issue is, will that person know what cleaving conditions may exist to cleave that protecting group suitably? And the patent- Suitably, there's your question. Okay, 100%. Let's say 100%. Let's stick with 100%, okay, within your- Because we, I mean, I continue to say- You injected that into this, in your petition. You were the one who injected the 100% concept, right? We injected SBS for motivation. If you look at what we say for reasonable expectation of success, we go back to labeling. And that, and so we said for the motivation, you would look to Zhu and Chen and SBS. But for the reasonable expectation of success, which is a different thing, okay, you've looked at the two resources, there's enough to guide you to those two. Now, will a person skilling or actually think, can I get this to work according to the way I need to? The problem is, is the way I read the board opinion, despite its loose language, is that it never actually got to the kind of reasonable expectation of success that we think about as it relates to the claims. It was talking about success in getting back to Chen, which is what you're saying, getting, accomplishing what Chen accomplishes, which is SBS. And I agree that this claim doesn't claim SBS, but that's what you chose to say was the motivation, and you chose to show that that was the motivation. So, I mean, aren't you stuck with, I mean, I think that, I don't think you should have said that was the motivation, but that's the only one you came up with. So, I will address that, let me address that motivation, the 100%. Let's assume we're in the 100% world. First, I think that, fundamentally, a person of skill in the art would look at Zabgrani and Lubino and all the other art, Canuzzi, which is cited by Lubino, Magen Engel, which is also, which are talking about this reaction, which is a 100-year-old reaction that cleaves an azetomethyl group, the Sautinger reaction, quantitatively. They would not be deterred by Lubino. They would say, they would not feel like they had to accept the conditions that were in Zabgrani. That's the real question is, and I mean, on their face, they suggest that they might not work. Isn't that substantial evidence for the board's decision that you just wouldn't go to Zabgrani who should? But I think that that, first of all, I think the legal area— What's your evidence that they would? I mean, it is your burden. It is my burden, but I think that the burden isn't that I have to show you a document, an art that says, here is evidence that azetomethyl can, in DNA sequencing, be cleaved quantitatively. The question is, is it possible? Both in motivation— No, but I mean, your theory, and maybe I've got this wrong, but your theory is, to accomplish this and show this, you use the specific SBS methodology in Shen and combine it with Zabgrani. And you have to show some reason that a skilled artisan would have looked to Zabgrani. You can't just say, well, it's in the field, so they could have looked at it. I agree with you, Your Honor. Absolutely. So what evidence is there that they would have looked to it that's strong enough to overcome the evidence on the face of those two references that you might not have because they wouldn't have worked the way Shen wanted it to? Well, first of all, Chen actually mentions AZETO as a group to block the 3'OH. I think that's significant, and certainly direction. Right, but we're in the substantial evidence world here. I mean, I understand you've tried to frame this as a legal error, but this to me seems a substantial evidence question about whether there was a motivation to combine. And so if you're going to win, you're going to have to show me that it was so obvious that a person would have gone to Zabgrani that the board's findings to the contrary lack substantial evidence. And we believe that we did. And I just had my eye on the clock because I'd like to preserve a little bit. I'll give you a rebuttal back. We've only got one argument this afternoon. OK. Thank you, Your Honor. What evidence is that? I think the evidence is Knuze, which says that the cleaving efficiency, the cleaving efficiency is 100% or quantitative. Magan Engel, the cleaving efficiency, especially once I optimize it a little bit, gets to quantitative. Magan Engel also says, remember, this reaction is a two-step. There's the conversion of the azide to an amine, and then the hydrolyzation of the amine, which really is, everyone agrees, is incredibly rapid. So there is evidence. And we also don't think, we think that the standard is, and I know I'm going back to this, and I don't mean to not, let me try to address your question more, is I think those are, that is evidence. And I don't think that what Illumina has done, other than say, here's something that says 60 to 80, not in Zabgarotney, but in something else that's like Zabgarotney, and that that would make a person of skill in the art conclude definitively that they couldn't get. Because then there is no creativity. Maybe I would agree with you. But the board made that as a finding of fact. So that's, you know, we can't just disregard it because you don't think it's good evidence. Well, but just because it's a substantial evidence standard doesn't mean that they can just, I mean, there is still a standard, and there still is, thankfully, a review. And I think that their evidence, which also under Walder is misapplying the standard to get there, is this corrupted view that Lubino is 60 to 80 and can't be optimized. Or that a person of skill in the art, when faced with the situation, and would not think to themselves, well, can I think of any cleaving conditions that can get me to 100%? Is quantitative 100% or essentially 100%? It's essentially 100%. It's really over 90. The problem I'm still having is the notion that you didn't say that one of skill in type of cleaving, you said one in the art would combine these things for purposes of accomplishing the type of cleaving that would lead to your ability to conduct synthesis by sequencing. So, I mean, you took the board down that road. You went down that road. Where in the record do you have, before the reply, which we can address later, but do you have anything that says to the board, or alternatively, it would show if you don't need the actual SBS, you could accomplish this other thing? We do. In our petition, we don't talk in the petition explicitly about cleaving conditions. Because, I mean, to take a step back, we still did it by the claims, with the claim chart. And not only is there not quantitative cleavage in the claims, but the patent itself says cleaving conditions would be obvious. They say protecting group would be obvious. They construe the claims to say the protecting group doesn't even need to be removed, which happened after our petition. So we have to react to that. And they base that on the ground that they shouldn't. Well, didn't the board come up with that construction for purposes of assessing the petition in the first place? They did. The sequence of events is we submit our petition and the backing declaration. And then thereafter, after discovery, there's the petition granting. And we think that that shows that we did meet the prima facie case, like the Belden case discussed in some way. But if you thought that that claim construction changed things, why didn't you ask to amend your petitions to not require SBS as a motivation to combine? Well, first, we handled it in the reply. I mean, the claim construction was the claim construction. And then there was the response. And we handled everything in the reply. And we felt that everything we said in reply, and I think that's right, was responding to what was in the response. Well, I think also that it's not formalistic or superficial of us to point out that when we were talking about motivation, which is this expansive and flexible standard, we did talk about the SBS motivation. And we did say, look, a person's skill in the art, there are the things that a person's skill in the art can't optimize, like size, placement, bonds. Let's look at that, ether bonds. These are all the indications and directions and teachings that Ju and Chen are providing for the protecting group. And one even says, look at Isido groups. And then there's things that a person's, and Dabrani gives all of that. And then a person's skill in the art, this person's skill in the art is going to say, I can optimize that. Now, but in our petition, I'm sorry, Your Honor, go ahead. You mentioned the reply brief, and I want to give you an opportunity to say something about it so that you don't waive any ability to respond to it. But even if we agreed with you that some of the arguments that were presented in the reply brief probably should have been allowed, because they do sort of flow from your original petition. Even if we agree with that, don't you have a problem in that those arguments were not predicated on your initial expert report? And that the Board found that the way you incorporated your reply expert report was separately inappropriate? I don't think we do, Your Honor. First, I think the Board did rule on it, and obviously part of my job is to convince this panel that they got that part wrong too. The responses, I think, do have a, or our reply does have a connection to the petition. I think, again, in the petition, we say, and in the declaration, we say, if a person of skill in the art finds these structural things, then they will also find these other functional issues. We said, such as, and we mentioned a couple, like incorporation. There was no data. This is the pioneering first days. Zhu, Chen, no one had data. No one had actually done anything except, these were prophetic patents. So we said, such as. We'd actually given the patent at the time in the claims, in our claim chart. Frankly, it didn't seem like the cleaving condition, particularly given the fact that to get that patent, Illumina said to the world, don't worry about cleaving inefficiently. Don't worry about the cleaving conditions. A person of skill in the art will know that. And in the Illumina Columbia case, which involves related technology, that was a big issue for the case, where in that one, Columbia was arguing a very related technology that, well, a person of skill in the art wouldn't have known to synthesize the nucleotide in certain different ways. It was too complicated, too beyond the ken. And the court said, well, then they should have disclosed it. Because otherwise, you have this basic injustice. The basic injustice is there's a patent out there that ties up commerce between competitors on grounds that it admits are obvious. Any other questions? OK. Thank you. I'll give you three minutes for rebuttal, and we'll give your friends on the other side an extra six minutes if they need it. OK. May it please the court. Bill Zimmerman of Kenobi Martins for Pelley Illumina. I'd like to start with the issue of reasonable expectation of success and whether the board applied an improper standard. I think we can all agree that the board articulated the correct standard. It's on pages 9 and 10 of the opinion, citing the KSR and the DuPuy case. The question is, did they apply that standard or some other standard? Well, wait. If the board was looking to the prior art references and to say, are we looking to see whether there's a reasonable expectation of success in accomplishing what the prior art references accomplished, then that would have been wrong, right? It would have. But if you look at what they did here, they didn't do that. And I'll walk you through how we get there. IBS relies on two quotes from the opinion, and they're on pages 14 and 21. They're the only time that the board says expected. And the quotes are, the prior art suggests that an ordinary artisan would not have expected Zafgar Rodney's azitometho group to be removed quantitatively as Chen requires. But then they couched that as if they were doing a reasonable expectation of success analysis, but they weren't. They weren't. They were responding directly to an argument. Or if they did, it was a wrong one. Well, they weren't. They were responding directly to an argument that IBS made in the petition. If you look at page 1146 of the joint appendix, and this is the declaration of- Which volume is that in? It's in volume two. Okay. And this is the opening expert report of IBS's expert. And in paragraph 76, the expert and IBS acknowledge the criteria for successful use of three prime blocking groups that are set forth in Chen. This is their opening petition and supporting declaration. And one of the criteria is the availability of mild conditions for rapid and quantitative deblocking. Now, there's no dispute here that that quantitative blocking means essentially 100%. In page 26 footnote 10 of their brief, IBS admits that their expert also admitted it at joint appendix 3586 and 87. Then if you go over to paragraph 77 of the declaration on the next page, one of the criteria of Chen, so they've imposed that the motivation requires meeting Chen's criteria, which they've already said is 100% efficiency. Yeah, but I mean, isn't really your argument just that they should be hoisted on their own petard because they phrased it wrong? Well, no. They should be hoisted on their own petard for phrasing it wrong. But if you go over to paragraph 81, this is where the main issue in the board's opinion comes from. IBS argued that one of ordinary skill in the art would also have expected the azido-methyl protecting group to possess the remaining desired functional properties from Chen. So they say one of skill in the art would have expected that Zavgarodny has this. The two things they quote from the board are simply the board's factual findings that know the evidence shows one would not have expected that. The board wasn't talking about expectation of success in making the claimed invention. The board was responding directly to what their expert said would have been expected based on the combination of Chen and Zavgarodny or Jun and Zavgarodny. I agree with you that that's a fair reading of what the board said, but it also would be a fair reading of what the board said to say they applied the wrong legal standard. In view of the opinion and the quoting of the correct legal standard and the fact that what they say directly responds to what was argued by the expert, I would posit that the more coherent reading is they were responding directly to what was argued. And IBS has taken snippets of the opinion in an effort to try to manufacture a legal issue. Okay. Well, what if all they said in their petition was that one of ordinary skill in the art would have had a reasonable or would have been motivated to combine the Chen to the extent it contains a labeling element and would have been motivated to combine that with Zavgarodny to the extent that it allows for cleaving of the protective unit in a milder way, and they didn't say for purposes of accomplishing SBS. Would that have changed the whole thing? No. The board went on to say that IBS argued this in the context of SBS. But even if they hadn't, and I believe it's on page 18 of the board's opinion, where they say there's no evidence or motivation in this record of combining Chen or Jun with Zavgarodny for the smaller or the broader purpose of labeling, there's simply no evidence that one would have been motivated to do that on this record. So the board took a belt and suspenders approach. They said on the narrow issue of SBS, you haven't shown that one would make the combination. And why did the board conclude that? Did the board say that it was only because they only tried to prove that you would make the combination for purposes of accomplishing SBS? There was no expert testimony in the petition. There was no argument in the petition that you would combine Jun or Chen with Zavgarodny for any purpose other than SBS. The only argument that was made in the petition, and it's in paragraph 77, and there's a corresponding that paragraph 77 on JA 1147 deals with the Chen and Zavgarodny combination. There's a matching paragraph for Jun and Chen. But the only reason they gave for combining these is to improve the efficiency, reliability, and robustness of the sequencing by synthesis method taught in Chen. I know. You understand the difficulty here that one would have looking at this from our perspective, and that is that this patent really doesn't have anything to do with SBS. No. I mean, the patent... Maybe it should have. I don't understand the restriction requirement, and I'm not sure why you didn't fight it. But putting that aside, this patent doesn't claim SBS. The claims at issue don't claim SBS. The uses of these nucleotides is predominantly SBS. The reason you make these nucleotides is SBS. That is the primary use of them. But the claim doesn't say... The claim is not limited to that. Right. It doesn't say labeling and removal of protective group so as to allow SBS to occur. It doesn't. The claim says that the three-prime protecting group has to be an azido group, and it has to be removable to regenerate a three-prime hydroxyl group. The reason you regenerate that is for purposes of SBS. But it wasn't the patent that set the framework we're working in. It was IBS's petition. They could have come to the board and said, here's a bunch of art and labeling. Here's a declaration on why somebody would do this for labeling. But there is no evidence in this record that anybody would do this for any reason other than SBS. And the only challenge that was presented was based on SBS. And at the hearing before the board, when IBS tried to argue that this should be for a reason beyond labeling, the board called them on it. And the quote is... It's at Joint Appendix 620. But to a certain extent, the art that's being relied upon is all sequencing by synthesis, i.e. so to a certain extent, that's kind of the environment that we are working in because that's what the challenges are based on. The board recognized that it was a narrow challenge based on a particular motivation to combine these things. Could IBS have done it differently? Yes. But what they chose to do and the reason they gave for putting these things together was strictly for sequencing by synthesis. Now, on the idea that there are multiple things you could have done to modify the removal conditions, and this gets into whether their evidence was or was not improper, the board found that the only thing they argued was SBS. They didn't argue any type of labeling until reply. They didn't argue changing Zafirodny's removal conditions at all until reply. They didn't present any evidence showing that Zafirodny's removal conditions would be quantitative or give you 100% removal, even though they acknowledged it in their petition and their supporting declaration. All of this evidence came on reply. And the board said, wait a minute. Our rules require that if you need a piece of evidence for your prima facie case, it has to be on reply. And you can't submit new arguments. And there is nowhere in the petition or the supporting declaration that talks about modifying Zafirodny's removal conditions. There's no discussion of use other than SBS. No evidence of any sort. And so the board properly excluded all of their reply evidence. And under the trial guidelines for the board, they are entitled to exclude the reply and the supporting evidence when you violate the scope of reply. So any violation, you can exclude the entirety of the reply. And the trial guidelines are very specific that they're not going to sort out what's proper and what's not proper. And IBS can't point to any place in its petition or supporting evidence where they argued modifying Zafirodny's removal conditions or a broader use than SBS. Moreover, they improperly incorporated materials from Branschow's second declaration that aren't cited in the reply brief. There are 16 exhibits in his second declaration that aren't cited anywhere in the reply. And that violates the board's rule on improper incorporation, which the board found. So before they can rely on any of this evidence to support their appeal, they have to show that the board abused its discretion in excluding this evidence. On this record, we don't believe they can meet that standard. They haven't shown where these things were in the petition and addressed each and every basis for the exclusion. Because if any of them apply, the board was proper in excluding the evidence. That includes the Newsy reference. The Newsy reference is the one thing they point to and say, well, this shows that one of skill in the art would have expected quantitative cleavage using Zafirodny's removal conditions. The problem is it wasn't in the petition. It wasn't in the supporting declaration. Well, Mr. Barron said it was in the petition. The Newsy reference first came in on reply through Dr. Branschow's second declaration. Was the Newsy reference referenced in Lubenow? No. Lubenow refers to the Newsy reference in a citation. But the reference itself wasn't proffered. It wasn't discussed in the petition. It wasn't discussed in the opening declaration. It only came in in reply. And when you look at the Newsy reference, it uses triphenylphosphine in a solvent called THF. And THF wouldn't work with this system because it would destroy the DNA. It would denature the DNA. Moreover, Newsy didn't involve nucleotides or nucleosides, which is what we're analyzing here. And so the data in Newsy doesn't show quantitative cleavage even if you were to consider the reference. The other one they cite too is Mag and Engels. That one uses triphenylphosphine with pyridine. Pyridine was also a known DNA denaturing agent. And so the board's findings that even if we considered these references, they wouldn't carry your burden of showing that they would work with Ju and Chen is supported by substantial evidence in this case. I would like to turn to one separate issue. And it came up during Mr. Barron's argument. It came up a couple of times in the brief. This idea that Chen itself teaches an azido group. And therefore, you could get a basis for obviousness from Chen. It's at page joint appendix 1011, lines 12 through 17. And they reference it on pages 16 and 25 of their brief. Chen does disclose an azido group as one of the groups you can put at the three prime position. Right. And they say that in their petition. They do. And the board cited it in the institution decision. But it's noticeably absent from the board's final decision. And there's a reason. Their expert admitted at his deposition, and it's joint appendix 5988 through 89, that this particular group in Chen is not removable to regenerate a three prime hydroxyl group. So it doesn't meet the claim language that it has to be removable or modifiable to regenerate that three prime hydroxyl group. That's why the board never addressed it. That's why this argument never went anywhere. Because their own expert admitted that what's disclosed in Chen doesn't get you what you need for the claim. And so the issue went away. What you need for the claim, or what they would have needed to practice Chen? Both. In order to practice Chen's SBS method, you have to block the three prime position. Right. And then remove it, regenerate a three prime OH so that the next one can attach. And their expert said that the N3 group disclosed in Chen, you can remove it, but it doesn't regenerate a three prime OH group. And so it wouldn't work for SBS. Right. It wouldn't work for SBS, but it would work for the claims. No. The claim here says that it has to be removable or modifiable to regenerate a three prime OH. And their expert admitted- Say to regenerate, or just say just capable of being removed? The exact claim language is, said protecting group can be modified or removed to expose a three prime OH group. And their expert admitted that when you remove the N3 group disclosed in Chen, it doesn't create a three prime OH group. And so it doesn't meet the claim language. It wouldn't work for the SBS method of Chen. And so that issue became a non-event. But given the couple of references in the brief and during oral argument, I wanted to make sure there was no confusion about that. And if the panel doesn't have any further questions for me- You concede if there were references as to which there were motivations to combine, those references would not have to teach SBS in order for them to be able to read on these claims, right? If there were references that suggested putting Zhu and Chen together with Zavgarodny, for a purpose other than SBS, and that had been argued to the board, then the board would have had to consider it. But in this case, it wasn't. And so that never came off record. There were no references suggesting that combination. And IBS didn't suggest making that combination for any reason other than SBS. Okay.  but I do want to express my sincere thanks to the panel for moving this from the 23rd to today. I was the one with the scheduling conflict and I greatly appreciate the court's indulgence. You're welcome. We take into account that lawyers are human, too. Or at least not on missions. We couldn't have known what we were doing. We appreciate this very greatly. And also know that neither of us are on missions. Our kids will- Right. Why don't you respond to that very last argument? In other words, do you agree that you never really made an argument that you could combine Ju and Chen with or without Zavgaradny for some purpose other than accomplishing SBS? I agree that that was the motivation we proffered. It was not for expectation of success. I think that for motivation, that doesn't mean that the person of skill in the art has to see something that explicitly says it can be cleaved at 100% in order to know that it can. This person of skill in the art would look at things and say, can I do this? Is it possible? And the fact is Zavgaradny and Lubino were praising Isidro Methyl. And they would know better than to be- they wouldn't be tricked or fooled or deterred by the 60 to 80. And they would, of course, look to Canuzzi. And I said that Canuzzi was referred to by Lubino. Canuzzi was not in that petition. But Canuzzi is cited to by Lubino. So once they start saying, and the board starts saying, you're stuck with these conditions in Zavgaradny, that's the only conditions for cleaving that a person of skill in the art would know, the ones that are being presented to it. And we think that that's wrong legally and factually. And I do want to, just to back up something, I want to read from something that was in our petition. And this is actually the declaration, because it was the thing I could grab easiest. It's at JA 1148. And it's also- Which paragraph? 81 and 82. And there's also at 1141, there's similar language as it relates as a Jew. We say, because Zavgaradny, or our expert says, teaches that Isidro Methyl has the foregoing chemical and structural properties taught by Chen, one of ordinary skill in the art would have expected the Isidro Methyl protecting group to possess the remaining desired functional properties of the Chen protecting groups, such as. Now, granted, I think we erred from thinking this was so obvious. And boy, I won't make that mistake again. But we say, such as not interfering with recognition of the modified nucleotide by polymerase and re-initiation of the DNA synthesis. We do not say cleaving 100%. But I think such as means it's illustrative. And I think what we're saying here is, person's skill in the art. And then also, we have a, no, not that. We have another deposition where our expert says, and I will get you the site in a moment, says, once I know it's mild, thank you. It's at JA 3587, where he says, and this was the first deposition, not the second. I think mild is an operational definition. The mild enough to achieve this objective, which is rapid and quantitative deblocking as part of this process that Chen is describing. So I think a person's skill in the art is going to, and we say that in our petition and in his declaration, and it's clarified again in their deposition before they even respond. Once you get the structural stuff, a person's skill in the art's going to think everything else is going to be possible or is going to come. And then we go on to say that paragraph 82 in JA 1148, additionally, one of ordinary skill in the art would have had a reasonable expectation of success in making and using a nucleotide within a xenomethyl protecting group to label a nucleic acid molecule by combining the teachings of Chen and Zabrani. We say the same thing at 41, JA 1141, or our expert does, and we say the same in our petition with regard to Jew. And we also say it in our claim chart. So we do make a distinction between motivation and labeling for the expectation of success because reasonable expectation of success is the Pfizer case, Apitech is classically, demonstrably required to be consistent with the claim scope. Right. I agree with that, if that's what the board was really looking at, that kind of expectation of success. I don't know that the board ever got there. And I think, as I said, I think it's a fair reading of what the board was trying to do to say, you said you combine them for purposes of accomplishing SBS, but there's no evidence that one would think you could accomplish SBS as laid out at Chen with this combination. I mean, I think that's where the board was going. So I think you ought to focus more on whether or not, not the legal standard, but whether or not the factual findings would support that conclusion. Thank you. And as we've said, and as we think it does, of course, we are relying on some evidence that is in the reply. What I read in the testimony and the argument that I referred to in our petition, the supporting declaration deposition, that was it. It was enough for the board to think we met the prima facie case. I will say that the board, this is not, this was something that they recognized and they proceeded. They said, this is really about, does the azetamethyl go to the three prime OH? Does it protect it? And does it decouple? So that it re-exposes the OH. And that's what Zabgarani teaches. I do think that Kanuzi- Do you agree with your friend on the other side who said Kanuzi, or however pronounced that reference, that that one would actually not allow you to reinitiate the synthesis? No, and I think that what Bill, Mr. Zimmerman was saying was, there was two points. One, on the issue of Chen referring to azeto, there was testimony where he said, I'm reading that in the carbon. So basically what he said was, as I read it, it's not anticipation for at least claim one, where everything is contained in Chen. Because I think there, it's probably attached to a carbon. But as he clarified when they jumped on them in the, on their response, he said, look, I think you're reading that a little narrowly. I'm also, I answered the question. We, and we certainly, he refers to that in his petition and in his declaration in the petition. He said, I still think that Chen is pointing a person of skill in the art. Okay, so it's not anticipation, but it's pointing us to look at three prime OH hydroxyl protecting groups. That's what Chen is talking about at that passage. He says, such as, and he mentions in three. So it's certainly direction. Just like the fact that MOM is the kind of one of the classic pointed to protecting group that Zhu identifies. And Zadgarani identifies MOM too. And then he says, but the one that's of special interest is azetomethyl. So a person of skill in the art, given Kanuzi, given that he's reading or she's reading, it says quantitative cleavage of azetes to amines. Quantitative cleavage of the second step. Lubino is pure product yield, which is, okay, the denominator is everything we put into the solution to begin with. And after I do 100 reactions, how much is left? And you can lose a ton of stuff. And so that is, and Vogel, a treatise we recite to, says the difference between a cleaving efficiency and a pure product yield can be significantly different. Okay, we're way past your time. Thank you, Your Honors. All right. Thank you all. The case will be submitted.